The issue: whether absolute immunity is a viable defense on behalf of the Mayor and members of the City Council of the City of Birmingham, in their individual capacities, in a claim based on negligence and abuse of discretion in the exercise of their respective legislative functions. We hold that it is, and affirm.
In May of 1981, the City of Birmingham, through the city council, adopted a master plan for the redevelopment and renewal of *Page 103 
downtown Birmingham. Implementation for projects such as the master plan is provided for in Code 1975, § 24-2-1, et seq.
That chapter provides, in part:
"§ 24-2-1.
"(a) It is hereby found and declared:
 "(1) That there exist in many communities within the state blighted areas, as defined herein, or areas in the process of becoming blighted;
 "(2) That such areas impair economic values and tax revenues, cause an increase in and spread of disease and crime and constitute a menace to the health, safety, morals and welfare of the residents of the state, and that these conditions necessitate excessive and disproportionate expenditures of public funds for crime prevention and punishment, public health and safety, fire and accident protection and other public services and facilities;
 "(3) That the clearance, replanning and preparation for rebuilding of these areas and the prevention or the reduction of blight and its causes are public uses and purposes for which public money may be spent and private property acquired and are governmental functions of state concern;
 "(4) That redevelopment activities will stimulate residential construction which is closely correlated with general economic activity and that the undertakings authorized by this chapter will aid the production of better housing and more desirable neighborhood and community development at lower costs and will make possible a more stable and larger volume of residential construction, which will assist materially in achieving and maintaining full employment; and
 "(5) That it is in the public interest that advance preparation for such projects and activities be made now.
 "(b) The necessity in the public interest for this chapter is hereby declared as a matter of legislative determination."
"§ 24-2-2.
 "[A]ny incorporated city or town may carry out any work or undertaking, hereafter called a `redevelopment project':
 "(1) To acquire blighted areas, including slum areas, with buildings or improvements which, by reason of dilapidation, obsolescence, overcrowding, faulty arrangement or design, lack of ventilation, light and sanitary facilities, excessive land coverage, deleterious land use or obsolete layout, or any combination of these or other factors, are detrimental to the safety, health, morals or welfare of the community;
 "(2) To acquire other real property for the purpose of removing, preventing or reducing blight, blighting factors or the causes of blight;
 "(3) To clear any areas acquired and install, construct or reconstruct streets, utilities and site improvements essential to the preparation of sites for uses in accordance with the redevelopment plan;
 "(4) To sell or lease land so acquired for uses in accordance with the redevelopment plan; or
 "(5) To accomplish a combination of the foregoing to carry out a redevelopment plan."
In September of 1981, the Birmingham city council, by resolution, approved and adopted a "redevelopment plan" for Block 60 in downtown Birmingham. That resolution designated Block 60 as a blighted area and provided that all real property of Block 60 was to be acquired by purchase or condemnation, cleared, and redeveloped for office, residential, and retail use.
At about the same time, the city council passed another resolution authorizing the mayor to enter an agreement for the City with a developer for the redevelopment of Block 60. That agreement, in turn, provided that the developer would use its best efforts to acquire by purchase all of the real property in Block 60. If, however, the developer were to fail in this endeavor by a deadline of March 30, 1982, the contract went on to provide that the City, upon notice from the developer of his failure to *Page 104 
purchase all of the land of Block 60, would acquire by purchase or condemnation all remaining property in Block 60. Further, if the City could not purchase the remaining land within 60 days of receipt of the developer's notice, the City would be required, by the contract, to proceed with condemnation prosecutions.
In October of 1981, Appellants filed for a declaratory judgment and damages, claiming that Appellees had acted arbitrarily and capriciously in determining that Block 60 was blighted and that Appellants were denied a meaningful opportunity to be heard prior to the declaration that Block 60 was blighted, thus denying them due process of law. Appellants further alleged that Block 60 is not blighted. The relief sought in the complaint was a declaration that Block 60 is not blighted; that Appellees acted arbitrarily and capriciously in determining that Block 60 is blighted; that the resolution designating Block 60 as a blighted area is void; and that the contract between the City and the developer of Block 60 is void or illegal and of no force.
Appellees filed a motion to dismiss for failure to state a claim and to eliminate certain defendants. As to the individual defendants, the trial court held:
 "1 The declaration of Block 60 . . . as a blighted area was a legislative act. (Housing Authority of Roosevelt City v. Nunn, 292 Ala. 60, 288 So.2d 775
(1974)). The Court finds from the various authorities cited by the defendants that the members of the City Council and the Mayor are not individually liable for acts done in their legislative capacity. It is the opinion of the Court that the holding in the case of Jackson v. The City of Florence, 194 [294] Ala. 592, 320 So.2d 68 (1975), does not change this principle.
". . .
 "Based on the above, it is therefore, ORDERED, ADJUDGED, AND DECREED by the Court as follows:
 "ONE: The Motion to Dismiss the members of the City Council and Mayor Richard Arrington, Jr., as individuals is granted."
Pursuant to the court's Rule 54 (b), A.R.C.P., order, plaintiffs bring this appeal. We affirm.
We have been most careful in posturing the issue presented here in restricted terms. Because this appeal is before us after the entry of an order pursuant to ARCP 54 (b), we may not address issues still pending in the trial court.
The issue on appeal, then, is the narrow question of whether the members of a city council and the mayor of the city, in their respective individual capacities, are entitled to absolute and unqualified immunity from personal liability in the performance of their duties in the consideration and adoption of a resolution pursuant to statutory authority for that action.
Individual liability of a public officer for injuries resulting from his tortious conduct and a municipality's immunity from suit are principles addressed by this Court as recently as February 5, 1982, in two cases released that day:DeStafney v. The University of Alabama, 413 So.2d 391 (Ala. 1982); and Rich v. City of Mobile, 410 So.2d 385 (Ala. 1982). See, also, Bell v. Chisom [MS. July 16, 1982] (Ala. 1982).
In DeStafney, an employee of a day care center operated by the University placed a child on a piece of playground equipment from which the child fell and suffered severe injuries. On rehearing, this Court held that "the defense of sovereign immunity afforded by Ala. Const., 1901, § 14, to the University of Alabama and its President, Dr. Mathews, does not extend to [the] employee whose alleged tortious act is the basis of the claim." DeStafney, 413 So.2d at 392. (Emphasis supplied.) The DeStafney Court went on to state that the tort liability rule for public officials and employees ofRestatement (Second) of Torts, § 895D, Public Officers (1974), is consistent with Alabama's case law development in the area of "substantive immunity." That section of the Restatement
provides:
 "(1) Except as provided in this Section a public officer is not immune from tort liability. *Page 105 
 "(2) A public officer acting within the general scope of his authority is immune from tort liability for an act or omission involving the exercise of a judicial or legislative function.
 "(3) A public officer acting within the general scope of his authority is not subject to tort liability for an administrative act or omission if
 "(a) he is immune because he is engaged in the exercise of a discretionary function,
 "(b) he is immune because he is privileged and does not exceed or abuse the privilege, or
 "(c) his conduct was not tortious because he was not negligent in the performance of his responsibility."
In Rich, the Court was faced with the question of whether to impose liability upon a municipality for damages resulting from its agent's negligent inspection, or negligent failure to inspect. While recognizing a municipality's general liability for the negligence of its employees acting within the line and scope of their employment (Jackson v. The City of Florence,supra; Code 1975, § 11-47-190), we nevertheless upheld municipal immunity in Rich.
The Rich Court held that the public policy considerations of a city's paramount responsibility to provide for the public safety, health, and general welfare, and the individual building contractor's primary responsibility for proper construction and inspection (as opposed to the inferential reliance that can be placed on the municipality's inspector's report), outweighed the reasons for the imposition of liability on the municipality. This exception to the general rule of liability, however, is only to be applied in "those narrow areas of governmental activities essential to the well-being of the governed, where the imposition of liability can be reasonably calculated to materially thwart the City's legitimate efforts to provide such public services." Rich, 410 So.2d at 387.
It is readily apparent, then, that liability is imposed upon a municipality pursuant to statute, or upon its employees pursuant to common law, in those cases where there has been some tortious conduct resulting in injury or where the agent of the municipality was not involved in one of those activities narrowly construed as being within the range of those services "essential to the well-being of the governed." This appeal does not fall into either of those categories. We are concerned here with the privilege of executing one's legislative function without fear of prosecution.[1]
Appellants claim that the city council, in adopting the resolution declaring Block 60 to be blighted, did not perform a legislative function because the action did not take the ultimate form of an ordinance. In support of this allegation, Appellants call our attention to the case of Rushing v. City ofGeorgiana, 374 So.2d 253 (Ala. 1979).
In Rushing, a city employee brought an action against the city to recover "disability" salary or compensation which had been approved by the council's passing of a motion. Although this Court held that the motion was ineffective, the opinion has a rather narrow application and is inapposite to the instant facts. In Rushing, despite a lengthy discussion of the traditional conflict in the definitions and uses of the terms "motion," "resolution," and "ordinance," the city council's action was held to be without effect because a specific statute (§ 11-43-8) requires that compensation for city employees, if not previously fixed by law, be fixed by ordinance. This Court expressly narrowed the effect of the Rushing decision by stating:
 "We hold that authority to pay this type of
compensation to employees of cities or towns must be found in an ordinance and not merely a motion or resolution." (Emphasis supplied.) Rushing, 374 So.2d at 255.
We find, however, that § 11-45-1 provides: *Page 106 
 "Municipal corporations may from time to time adopt ordinances and resolutions not inconsistent with the laws of the state to carry into effect or discharge the power and duties conferred by the applicable provisions of this title and any other applicable provisions of law and to provide for the safety, preserve the health, promote the prosperity and improve the morals, order, comfort and convenience of the inhabitants of the municipality, and may enforce obedience to such ordinances."
We find further, that Alabama case law, consistent with this statutory mandate, permits the enactment of laws by ordinance or resolution in the absence of a statutory requirement for a specific mode of enactment. Tucker v. City of Robertsdale,406 So.2d 886 (Ala. 1981). See, also, McQuillen, MunicipalCorporations, Vol. 5 (3rd ed., 1981), § 15.06.
The statute whereby the city council and mayor were empowered to act in the instant case, § 24-2-1, et seq., does not require a specific mode of enacting the laws by which redevelopment or renewal projects are initiated.
Additionally, the case of Housing Authority of Roosevelt Cityv. Nunn, 292 Ala. 60, 288 So.2d 775 (1974), held:
 "The general rule seems to be that a finding by an appropriate body under the urban renewal and redevelopment laws that an area is a slum or blighted area is legislative in character and must be upheld by the court unless it is shown that such finding is a result of arbitrary and capricious action or was induced by fraud or bad faith. Blankenship v. City of Decatur, 269 Ala. 670, 115 So.2d 459 (1959), and cases cited therein.
 "From the record it is obvious that the housing Authority determined that the area met the statutory definition for a neighborhood development project. . . ." Housing Authority of Roosevelt City v. Nunn, 292 Ala. at 61, 62, 288 So.2d 775.
Because we find 1) that the statutory authority for the initiation of a redevelopment project does not require the enactment of a particular form of legislation; and 2) that the city council and mayor were clearly executing their legislative functions, we hold that the trial judge properly dismissed the city council members and the mayor, in their individual capacities, as defendants in the pending action.
We adopt, as consistent with our holding, the public policy considerations discussed in Gorman Towers v. Bogoslavsky,626 F.2d 607 (8th Cir. 1980):
 "Indeed, the nature of municipal government may make the need to quell a legislator's fear of personal retribution particularly compelling.
 "Because municipal legislators are closer to their constituents than either their state or federal counterparts, they are, perhaps, the most vulnerable to and least able to defend lawsuits caused by the passage of legislation. Particularly in the area of land use, where decisions may have an immediate quantifiable impact on both the value and development of property, local legislators should be free to act solely for the public good without the spector of personal liability with the passage of each zoning ordinance." Gorman Towers, 626 F.2d at 612.
The judgment of the trial court, therefore, is affirmed.
AFFIRMED.
TORBERT, C.J., and FAULKNER, ALMON, SHORES, EMBRY, BEATTY and ADAMS, JJ., concur.
[1] For an excellent discussion of the foundations and historic background of the privilege, see Tenny v. Brandhove,341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). *Page 107